# In the United States Court of Federal Claims

No. 22-542

(Filed:_January 26, 2023)

|  |  |  |
|---|---|---|
| **UNITED WATER CONSERVATION DISTRICT,** | ) ) ) ) | Complaint alleging a physical taking of water rights; government's counter contention of inchoate regulatory action; ripeness; no final agency action |
| Plaintiff, | ) ) |  |
| v. | ) ) |  |
| **UNITED STATES,** | ) ) |  |
| Defendant. | ) ) |  |

Frank S. Murray, Foley & Lardner LLP, Washington, D.C. for plaintiff United Water Conservation District.  With him on the pleadings and at the hearing were David T. Ralston, Jr. and Julia Di Vito, Of Counsel, Foley & Lardner LLP, Washington, DC.

Peter Brocker, Trial Counsel, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C. for the United States.  With him at the hearing were Brian Herman, Trial Counsel, United States Department of Justice, Washington, D.C. and Christopher Keifer, Attorney Advisor, Southwest Section, Office of the General Counsel, National Oceanic and Atmospheric Administration, Long Beach, California.

## OPINION AND ORDER

LETTOW, Senior Judge.

Plaintiff, United Water Conservation District ("United"), has filed suit against defendant, United States ("the government"), for just compensation for a physical taking under the Fifth Amendment of the U.S. Constitution.  Compl. ¶¶ 65-68, ECF No. 1.  United alleges that the National Marine Fishery Service ("NMFS") took its water rights for a public purpose.  Compl. ¶ 67.  More specifically, it argues that NMFS's Office of Legal Enforcement ("OLE") in a letter dated June 9, 2016 caused United to implement measures to protect Southern California steelhead trout that resulted in its loss of beneficial use of water from the Santa Clara River.  *See* Compl. ¶ 68.  The government counters that plaintiff's claim is not ripe for adjudication because there has been no final agency action.  Def.'s Mot. to Dismiss ("Def.'s Mot.") at 4, ECF No. 9. Accordingly, the government seeks to dismiss the complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Court of Federal Claims ("RCFC").  *See id*. at 3-4.  It characterizes the alleged taking as regulatory in nature.  *Id*. at 4-5.  Plaintiff responds that the court has jurisdiction over its claim because it alleges a ripe physical taking, which does not

require final agency action.  Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n") at 14, 18, ECF No. 12.  After completion of briefing, *see* Def.'s Reply Mem. in Support of Mot. to Dismiss ("Def.'s Reply"), ECF No. 13, the court held a hearing on December 2, 2022.  *See* Hr'g Tr. 1:12 (Dec. 2, 2022).  The motion is ready for disposition.

## BACKGROUND[1]

### *A.  Legal Framework*

The water rights at issue in this action are governed by the Fifth Amendment of the U.S. Constitution and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44.

### *B.  United and the Vern Freeman Diversion Dam*

United is a California water conservation district, created under California law to serve as the water management agency for the Santa Clara River and the Oxnard coastal plain.  Compl. ¶¶ 1, 13.  The California State Water Resources Control Board ("State Board") issued United a license in 1958 (License 10173) and a permit in 1983 (Permit 18908), granting it the right to appropriate and divert water from the Santa Clara River for its beneficial use.  Compl. ¶ 1.  In 1987, United's permit was amended to allow for the construction of the Vern Freeman Diversion dam ("Diversion dam").  Compl. ¶ 22.[2]  The Bureau of Reclamation provided United with federal funds to build the Diversion dam.  *See* Compl. ¶ 30.

The Diversion dam is a concrete dam that diverts water from the Santa Clara River into United's Freeman Diversion Canal.  Compl. ¶ 15.  The diverted water is passed through a fish screen and into the Freeman Diversion Canal.  Compl. ¶ 17.  The water that passes through the Freeman Diversion Canal is used to recharge groundwater aquifers, deliver surface water to groundwater users, and stabilize the riverbed.  Compl. ¶ 15.

Water that the Diversion dam does not divert into United's Freeman Diversion Canal remains in the Santa Clara River and flows into the Pacific Ocean.  *See* Compl. ¶ 18.  Some of this water is first passed through a fish ladder or roller gate.  *Id.*[3]  "Bypass flow water used for the fish ladder or flowing into the roller gate does not enter the Freeman Diversion Canal."  Compl. ¶ 18.  Based on a California state study of the steelhead trout in the lower Santa Clara River, the 1987 state permit amendment that authorized the construction of the Diversion dam required the dam to include a fish ladder and water bypass flows that protect steelhead trout's migration upriver to spawn.  Compl. ¶¶ 22-24.

---

[1] The recitations that follow do not constitute findings of fact but rather are recitals attendant to the pending motion and reflect matters drawn from the complaint, the parties' motion and briefs, documents attached to the briefs, and the hearing.

[2] The license, permit, and amendment to the permit were not provided to the court.

[3] Water flowing into the fish ladder and remaining in the Santa Clara River is bypass flow.  *See* Compl. ¶ 4.

Under its State Board-issued license and permit, United was allowed to appropriate and divert water for its beneficial use. Compl. ¶ 14. Specifically, it was permitted "to appropriate and divert up to an instantaneous rate total of 375 cubic feet per second ('cfs') of water at the [Diversion dam]." *Id.* "On an annual basis, United is permitted to appropriate and divert 144,630 acre-feet per year at the [Diversion dam] (119,000 [acre-feet] for groundwater and 25,630 [acre-feet] for surface water)." Compl. ¶ 14. On average, between 1991 and 2014 United diverted 71,000 acre-feet of water yearly. Compl. ¶ 21.[4]

### C. *Endangered Species Act and the Steelhead Trout*

In 1997 NMFS designated the Southern California steelhead trout in the Santa Clara River as an endangered species under the ESA. *See* Compl. ¶ 26. This was six years after the dam was completed in 1991. *See* Compl. ¶¶ 16, 26. Section 9 of the ESA prohibits taking species that are designated as endangered or threatened under the Act. *See* 16 U.S.C. § 1538(a)(1)(B). Taking is defined in the ESA as "harass[ing], harm[ing], pursu[ing], hunt[ing], shoot[ing], wound[ing], kill[ing], trapp[ing], captur[ing], collect[ing]" or attempting to do so. *See* 16 U.S.C. § 1532(19). Harm means "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding[,] or sheltering." 50 C.F.R. § 222.102.

The government may authorize a taking otherwise prohibited by the ESA by granting an exemption under Section 7 of the ESA, 16 U.S.C. § 1536. The government may also allow a taking otherwise prohibited by the ESA by issuing a permit under Section 10 of the ESA, 16 U.S.C. § 1539(a). A Section 10 incidental-take permit can be issued "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." *See* 16 U.S.C. § 1539(a)(1)(B). "[T]he Secretary shall issue the permit . . . contain[ing] such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes of this paragraph" if the Secretary finds five criteria are met and "has received such other assurances as he may require that the plan will be implemented." 16 U.S.C. § 1539(a)(2)(B).[5]

---

[4] At the hearing on the government's motion to dismiss, counsel for the government averred that "the status quo for 1997 to 2008 . . . was that the Vern Freedom Diversion Dam was being operated by United Water and may or may not have been operating in such a way as to amount to a taking of steelhead." Hr'g Tr. 44:5-9.

[5] The Section 10 incidental-take permit provisions of the ESA require that the Secretary find that "(i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (v) the measures, if any, required under subparagraph (A)(iv) will be met." 16 U.S.C. § 1539(a)(2)(B).

**D.  Bureau of Reclamation, ESA Section 7 Proceeding, and NMFS's 2008 Biological Opinion**

Because NMFS designated the Southern California steelhead trout as endangered and because the Bureau of Reclamation provided funding to United for the construction of the Diversion dam and fish ladder, the Bureau brought a proceeding under Section 7 of the ESA in 2005 to enable United's ongoing operation of the Diversion dam.  *See* Compl. ¶ 30.  Under Section 7 of the ESA, a federal agency must ensure that actions it "authorized, funded, or carried out . . . [are] not likely to jeopardize the continued existence of any endangered species . . . unless such agency has been granted an exemption" under the Act.  *See* 16 U.S.C. § 1536(a)(2).  United represents that it supported the Bureau throughout the Section 7 proceeding.  *See* Compl. ¶ 30.[6]

On July 23, 2008, after considering the Bureau's request, NMFS issued a proposed Biological Opinion ("BiOp") that would expire in December 2011.  Compl. ¶ 31; Def.'s Reply at 3.  The 2008 BiOp "resulted in a jeopardy finding by NMFS," Def.'s Mot. Ex. A, at 2, and included two reasonable and prudent alternatives ("RPA's) to be implemented, *see* Compl. ¶ 31.  RPA 1 related to fish passage and RPA 2 related to bypass flow; RPA 2 discussed both adult steelhead trout migration downstream of the dam ("RPA 2A") and juvenile steelhead trout migration downstream of the dam ("RPA 2B").  Compl. ¶ 31.  In December 2008, the Bureau ended its involvement with the Diversion dam and terminated its Section 7 proceeding.  *See* Compl. ¶ 33; Def.'s Mot. at 2.  United represents that the Bureau reasoned that it was unable to take Section 7 action because it did not own or operate the Diversion dam.  Compl. ¶ 33.  United also represents that it implemented RPA 2A by 2016, but not RPA 2B because United determined that RPA 2B could be harmful to steelhead trout migration.  *See* Compl. ¶ 32.[7]  The government counters that United failed to implement the 2008 BiOp's RPAs.  *See* Def.'s Mot. at 2-3.

**E.  The Wishtoyo Foundation Action**

On June 2, 2016, Wishtoyo Foundation ("Wishtoyo"), Ventura Coastkeeper, and Center for Biological Diversity filed suit against United, arguing that it was in violation of Section 9 of the ESA because it did not have a Section 10 incidental-take permit.  Compl. ¶¶ 12-14, 89, 91; *Wishtoyo Found. v. United Water Conservation Dist.*, No. 2:16-CV-03869 (C.D. Cal., June 2, 2016); *see also* Compl. ¶ 47; Def.'s Mot. at 3.  Following a trial, on September 23, 2018, the

---

[6] Referring to this proceeding, a letter from the NMFS OLE in 2016 states that "United initially sought incidental take authorization under Section 7 of the ESA with the Bureau of Reclamation."  Def.'s Mot. Ex. A, at 2.

[7] In 2009, California Trout ("Cal-Trout") filed suit against United, arguing that it was in violation of Section 9 of the ESA because it did not have a Section 10 incidental-take permit and because the Bureau of Reclamation had terminated its Section 7 proceeding.  *See* Compl. ¶ 35.  That action was settled in August 2009, with United agreeing to implement aspects of RPA 2A from the BiOp, as well as other measures.  *See* Compl. ¶ 36.  United represents that it implemented measures to comply with the settlement between 2009 and 2016.  *See* Comp. ¶ 37.

district court held that because United did not have a Section 10 incidental-take permit, "United's operation and maintenance of the [Diversion dam], including the existing . . . fish ladder and . . . water diversion to the Freeman Canal and United facilities," Compl. ¶ 49, was an unauthorized take and therefore violated Section 9 of the ESA, *Wishtoyo Found.*, 2018 WL 6265099 at *77 (C.D. Cal. Sept. 23, 2018), *aff'd*, 745 Fed. Appx. 541 (9th Cir. 2020). The district court issued a permanent injunction on December 1, 2018, which was affirmed by the Ninth Circuit in 2020. *Wishtoyo Found.*, 2018 WL 7571315 (C.D. Cal. Dec. 1, 2018), *aff'd*, 745 Fed. Appx. 541 (9th Cir. 2020); *see also* Compl. ¶¶ 50-51.[8]

The *Wishtoyo* permanent injunction requires that United implement RPA 2 from the 2008 BiOp, including both RPA 2A and RPA 2B, until either United receives a Section 10 incidental-take permit or the district court reaches a different holding. *See* Compl. ¶ 50. The district court held that United must

> complete forthwith the necessary studies to evaluate all reasonable alternatives to the existing fish ladder, select a preferred alternative, and submit complete regulatory authorization requests to NMFS, the U.S. Fish and Wildlife Service ("USFWS"), the U.S. Army Corps of Engineers . . . [and] [b]y no later than June 30, 2020, United shall submit completed regulatory applications for the following: i. ESA section 10 incidental take permit and multi-species habitat conservation plan ("MSHCP") to NMFS and the USFWS for operation and maintenance of [the Diversion dam] and United's Diversion at the [dam] . . . . Nothing in this judgment precludes United from seeking incidental take authorization . . . through a section 7 federal consultation between a federal agency . . . and NMFS or the USFWS.

*Wishtoyo Found.*, 2018 WL 7571315, at *2-3.

### F.  NMFS' Office of Legal Enforcement's 2016 Letter to United

On June 9, 2016 NMFS's OLE issued a letter to United "to notify . . . United . . . that a significant issue regarding ongoing take of endangered southern California . . . steelhead [trout] exists at the [Diversion] Dam . . . , which United owns and operates." Def.'s Mot. Ex. A, at 1. That letter stated, in part:

> NMFS staff is of the opinion that United's operation of the Freeman Diversion has annually resulted in take of SC steelhead through death, capture[,] and significant impairment of essential behavioral patterns. Furthermore, without specific modifications, operation of the Freeman Diversion will certainly continue to result in take of SC steelhead [trout] on an annual basis. Because United does not have any authorization for the take of SC steelhead, all such takes are in violation of Section 9 of the ESA.

---

[8] The district court initially issued a judgment and permanent injunction on September 27, 2018, *Wishtoyo Found.*, No. 2:16-CV-03869 (C.D. Cal. Sept. 27, 2018), but this was amended by the order of December 2018.

. . .

United's cooperation to date in pursuing long term incidental take authorization through Section 10, while encouraging, has not included sufficient interim protection for SC steelhead.  Given United's current, multi-year schedule for obtaining an incidental take permit, and the dwindling number of adult SC steelhead returning to the Santa Clara River, NMFS believes that United must commit to implementing interim operating measures that are consistent with the operational criteria set forth in the RPA (i.e., elements 2(a) and 2(b)) and appurtenant terms and conditions (i.e., 1(a), 2(a-c), and 4(a-c)) of the 2008 Biological Opinion.  <u>In order to be effective in protecting SC steelhead during the 2017 migration season and subsequent migration seasons pending issuance of an incidental take permit, these measures must be in place before December 1, 2016.</u>

Absent a firm commitment by United to timely implement the RPA criteria and measures, combined with timely and accurate monitoring of implementation, NMFS intends to pursue legal options available under the ESA to ensure that adequate interim operating measures are in place to minimize the impending take of SC steelhead at the Freeman Diversion pending NMFS's evaluation of United's incidental take permit application.  I encourage United in the strongest terms possible to immediately institute the operational criteria and measures of the RPA.

. . . We request the courtesy of your response by August 8, 2016, regarding your plans to implement these interim operating measures consistent with the operational criteria set forth in the RPA.

Def.'s Mot. Ex. A, at 2-3.  United responded by August 8, 2016 to OLE stating it would implement NMFS's interpretation of RPA 2A but not RPA 2B.  It requested a discussion with NMFS about RPA 2B.  *See* Compl. ¶ 44.  OLE replied in September 2016 indicating that it took United's letter to indicate that it would implement both RPA 2A and RPA 2B by December 1, 2016.  *See* Compl. ¶ 45.  United represents that it complied, implementing NMFS's interpretations of RPA 2A and RPA 2B.  *See* Compl. ¶ 46.

### G.  United's Implementation of RPA 2A and RPA 2B

In implementing NMFS's interpretations of RPA 2A and 2B, United represents that it "increase[d] . . . bypass flow through the [Diversion dam] fish ladder and then to the Pacific Ocean."  Compl. ¶ 46; *see also* Compl. ¶ 64.  It argues that because its implementation of the 2016 OLE letter increased water flowing to the fish ladder remaining in the Santa Clara River, less water was available to be diverted to the Freeman Diversion Canal.  *See* Compl. ¶¶ 4, 46, 52.  Based on its modeling, United estimates that between 2017 and 2021 it "los[t]" 49,800 acre-feet of water that would have been diverted to the Freeman Diversion Canal.  *See* Compl. ¶ 53.  It states that its compliance has caused a loss of beneficial use of water including "a reduction in

water deliveries" and changes in water allocation to "its lands, inhabitants[,] and constituent groundwater users." Compl. ¶ 55.

### H.  United has not Applied for an ESA Section 10 Permit

United has not applied for a Section 10 incidental-take permit under the ESA,[9] but avers that it has started the internal process of applying for a Section 10 incidental-take permit, Compl. ¶ 34, including coordinating with NMFS on the development of a conservation plan, Def.'s Mot. Ex. A, at 2.  In the 2016 OLE letter, NMFS states that "[d]espite eight years of effort, take authorization, and the accompanying criteria and measures for the operation of the Freeman Diversion to reduce take of SC steelhead [trout]," any incidental-take authorization by United "appear[s] to be several years off."  Def.'s Mot. Ex. A, at 2.

### I.  Parties' Positions

United filed its complaint initiating this action on May 17, 2022, seeking 40 million dollars in just compensation for a physical taking.  Compl. ¶ 58.  The government responded by filing this motion to dismiss on September 16, 2022, claiming the court does not have subject-matter jurisdiction because there is not final agency action.  Def.'s Mot. at 2-3.

## STANDARDS FOR DECISION

### A.  Rule 12(b)(1) — Lack of Subject-Matter Jurisdiction

The Tucker Act provides this court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Tucker Act does not, however, provide substantive rights.  *See United States v. Testan*, 424 U.S. 392, 398 (1976).  To establish this court's jurisdiction under the Tucker Act, United must "identify a substantive right for money damages against the United States separate from the Tucker Act." *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004).  The Takings Clause of the Fifth Amendment of the U.S. Constitution can provide such a substantive right.  *See* U.S. Const. amend. V.  However, the claim must be ripe for adjudication for the court to have subject-matter jurisdiction over the claim.  *Schooner Harbor Ventures, Inc. v. United States*, 92 Fed. Cl. 373, 378-79 (2010).

United, as plaintiff, must establish jurisdiction by a preponderance of the evidence.  *See Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)).  When ruling on the government's motion to dismiss for lack of jurisdiction, the "court must accept as true all

---

[9]At the hearing, United's counsel advised that "United has been working actively to pursue an incidental take permit."  Hr'g Tr. 48:6-7.  Notice of applications for Section 10 incidental-take permits are required to be published in the Federal Register.  50 C.F.R. § 17.32(b)(1)(ii).  To date, notice has not been published.

undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc.*, 695 F.3d at 1163 (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). When the parties dispute alleged facts bearing upon jurisdiction, the court "may weigh relevant evidence." *Labruzzo v. United States*, 144 Fed. Cl. 456, 470 (2019) (quoting *Mildenberger v. United States*, 643 F.3d 938, 944 (Fed. Cir. 2011)). "If a court lacks jurisdiction to decide the merits of a case, dismissal is required as a matter of law." *Gray v. United States*, 69 Fed. Cl. 95, 98 (2005) (citing *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed. Cir. 1985)); RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## ANALYSIS

### A.  Jurisdiction

The government contends that this court lacks jurisdiction over the case on regulatory-takings grounds. *See* Def.'s Mot. at 4-5. The Tucker Act, 28 U.S.C. § 1491(a)(1), grants this court jurisdiction over non-tort claims against the government for money damages. Claims in the Court of Federal Claims are subject to a six-year statute of limitations. 28 U.S.C. § 2501. By contrast, United avers that this court has jurisdiction because its claim for a physical taking arises under the Takings Clause of the Fifth Amendment, which permits just compensation, or money damages. *See* Compl. ¶ 7. United contends that its claim accrued after the 2016 OLE letter, which discussed protecting the Santa Clara River steelhead trout, and therefore was filed within the six-year statute of limitations. *See* Compl. ¶ 8; Def.'s Mot. Ex. A, at 1-3.[10] The government argues that the taking was not a physical taking but instead a regulatory taking, and therefore its motion contests the court's subject-matter jurisdiction on the basis of ripeness. *See* Def.'s Mot. at 4-5. The government avers that United's claim is not yet ripe because United's water rights are subject to a permit process under the ESA and United has not yet applied for a permit. *See* Def.'s Mot. at 9-10; Def.'s Reply at 5-9. Because the case and controversy clause of the Constitution requires a ripe controversy for a federal court to hear a case, *see* U.S. Const. art. III, § 2, the court must address the context in which United's claim arises to satisfy itself that jurisdiction exists. *See Shinnecask Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015), citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

### B.  Water Rights

The government argues that United's water rights are not categorical but instead are subject to the ESA. Water rights, including both approrpriative and riparian rights, are usufructary under California law. *See Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1353-54 (Fed. Cir. 2013) (*Casitas II*). Under California law, appropriative rights are private

---

[10] United filed its complaint on May 17, 2022. *See* Compl. The government argues that the 2016 OLE letter, to which plaintiff tethers its claim, was not final agency action. *See* Def.'s Mot. at 4-5. Final agency action is relevant in the analysis of regulatory takings and certain physical takings. *See* Def.'s Reply at 7-8.

property rights, but those rights are limited to the beneficial use of water; the only compensable right "is a right to beneficial use." *Id.* ("[T]he holder of an appropriated water right, in other words, receives nothing more than this right to beneficial use and possesses no legal entitlement to water that is diverted but never beneficially used.") (quoting and upholding *Casitas Mun. Water Dist. v. United States*, 102 Fed. Cl. 443, 455 (2011)). In *Casitas II*, plaintiff argued that the right to divert and store an amount of water in turn meant it had a right to beneficially use that amount of water. The court rejected this argument. *Casitas II*, 708 F.3d at 1355.[11] The court also held that diverting and storing water were not in and of themselves beneficial uses. *Id.* at 1356.

International Paper Co. v. United States*, 282 U.S. 399, 407 (1931) also recognizes the right to use water. In that case, International Paper Company had a conveyance and lease to divert 730 cfs of water from the 10,000 cfs of water that Niagara Falls Power Company was entitled by New York state to divert via a canal. *See id.* at 404-05. When the President "place[d] an order . . . and . . . requisition[ed] the total quantity and output of the electrical power which [was] capable of being produced and/or delivered . . . through the use of all waters diverted or capable of being diverted through [an] intake canal," *id.* at 405, the Court held that the taking of power included the taking of water rights, specifically, the right to *use* the water, *id.* at 407.

Both United and the government recognize the beneficial-use standard for water rights. *See* Compl. ¶¶ 62, 65, 67; Def.'s Mot. at 9-10.[12] United claims that under its license and permit, it has the right to appropriate and divert up to an instantaneous rate of 375 cfs of water, or 144,630 acre-feet of water per year, Compl. ¶ 61, and that it "has a cognizable property interest to put . . . water diverted, up to its limits, to beneficial use." Compl. ¶ 62.[13] United uses the diverted water to recharge groundwater aquifers, deliver surface water to groundwater users, and stabilize the riverbed, putting it to beneficial use. *See* Compl. ¶ 15; Hr'g Tr. 29:8 to 30:23.

Nonetheless, United and the government interpret differently the limits on United's right to beneficially use the water. United suggests the right to beneficial use is categorical while the government claims it is limited by the ESA. United contends that the 2016 OLE letter caused it to implement NMFS's interpretation of RPA 2, therefore "increas[ing] the volume of bypass flow water to the [Diversion dam's] fish ladder and/or downstream of the [Diversion dam] for ESA purposes." *See* Compl. ¶¶ 62-65. It avers that this water otherwise would have been

---

[11] In rejecting the argument, the court noted that the pertinent license stated that Casitas could divert 107,800 acre-feet of water per year but "expressly limited the amount 'placed to beneficial use' at only 28,500 acre-feet per year." *Casitas II*, 708 F.3d at 1355.

[12] The government indirectly recognizes the beneficial use standard stating, "As a result, to the extent that the ESA will require United to divert water that it would otherwise have put to beneficial use, that claim is not yet ripe." Def.'s Mot. at 9; *see also* Hr'g Tr. 14:24 to 15:3; Hr'g Tr. 37:9-18.

[13] As noted previously, the parties did not submit United's permit, license, or amendment to the permit to the court. However, unlike in *Casitas II*, United does not represent that either the permit or license distinguished between the amount it could appropriate and divert and the amount it could put to beneficial use. *See Casitas II*, 708 F.3d at 1355.

"appropriated, diverted[,] and put to beneficial use, as authorized by" its license and permit. Compl. ¶ 65. At the hearing on the government's motion to dismiss, counsel for United stated that its "license had a categorical right for it to be able to divert up to the maximum that it's allowed," and that at the time of the license, the ESA did not restrict this right. Hr'g Tr. 25:1-7.[14] The government focuses on when the government action enforcing ESA limitations on water rights occurs, including the Act's permit procedures statutorily laid out. *See* Def.'s Reply at 8-9; Hr'g Tr. 49:22 to 50:13. United's beneficial-use rights are subject to the ESA. *See* 16 U.S.C. § 1538 (applying to the take of any designated species "within the United States"). Although United recognizes that the government can repurpose the use of water under the ESA, the court must consider the limitations that the ESA puts on the rights involved.

### *C. Takings Law*

The parties disagree about whether United's claim should be analyzed under the physical takings doctrine or the regulatory takings doctrine. The Takings Clause of the Fifth Amendment states that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. To establish a taking under the Fifth Amendment, a party must prove that it had "a property interest for purposes of the Fifth Amendment" at the time of the alleged taking. *See Caquelin v. United States*, 140 Fed. Cl. 564, 572 (2018) (quoting *Members of the Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005)); *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001) ("[O]nly persons with a valid property interest at the time of the taking are entitled to compensation."). A party also must prove that the government's actions "amounted to a compensable taking of that property interest." *Caquelin*, 140 Fed. Cl. at 572 (quoting *American Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004)). A taking can be either a physical taking or a regulatory taking. *Caquelin*, 140 Fed. Cl. at 573.[15] A physical taking occurs when the government directly appropriates property or "engages in the functional equivalent of a practical ouster of [the owner's] possession." *Katzin v. United States*, 908 F.3d 1350, 1361 (Fed. Cir. 2018) (quoting *Washoe Cnty. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2013) (internal quotations omitted); *see also Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). Although property can be regulated without giving rise to a Fifth Amendment taking, a regulatory taking occurs when a regulation goes too far. *Caquelin*, 140 Fed. Cl. at 576-577. Three different circumstances lead to regulatory takings; the first two result in *per se* regulatory takings. The first circumstance occurs when government regulation causes a person "to suffer a permanent physical invasion of [their] property." *See Katzin*, 908 F.3d at 1361 (quoting *Casitas Mun.*

---

[14] Counsel for United continued to state, "this is a new development that is impinging upon . . . the amount . . . that it can divert up to its property rights." Hr'g Tr. 25:4-7. United's counsel noted, however, that "the government . . . ha[s] the ability under the ESA to repurpose the use of the water for its own public purpose . . . but . . . if they are going to do that, they have to compensate United for the lost beneficial use it had of the water." Hr'g Tr. 25:8-16. "[T]he [g]overnment has to bear that externality of the ESA." Hr'g Tr. 25:16-18.

[15] A physical taking or regulatory taking can be either categorical or non-categorical and can be either temporary or permanent. *Caquelin*, 140 Fed. Cl. at 573.

*Water Dist. v. United States*, 543 F.3d 1276, 1289 (Fed. Cir. 2008) ("*Casitas I*")); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 438-441 (1982) (holding that installation of cable television wires was a permanent physical invasion of the owner's property and was a regulatory taking requiring just compensation under the Fifth Amendment).  The second circumstance occurs when government regulation "denies [an owner] all economically beneficial or productive use" of their property.  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015-16 (1992).  The third circumstance, which is analyzed under a multi-factor balancing test, occurs when a regulation restricts the owner's use of their property to an extent that is compensable under the Fifth Amendment.  *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).  When determining if a taking was physical or regulatory, a court should focus on the character of the government action.  *See Casitas I*, 543 F.3d at 1290.

Both *Casitas* and *International Paper Co.* involve an alleged taking of a water right.  In both cases, the alleged taking was physical in nature.  *See Casitas I*, 543 F.3d at 1296; *International Paper Co.*, 282 U.S. at 407.  In *Casitas*, Casitas had the right to divert water from the Ventura River into the Robles-Casitas Canal for its beneficial use.  *See Casitas I*, 543 F.3d at 1286-1287.  In 1997 NMFS listed the West Coast steelhead trout as an endangered species under the ESA.  *Id.* at 1282.  The government in turn required Casitas to build a fish ladder and divert water to it.  *See id.* at 1281-82, 1290-92.[16]  The Federal Circuit held that "the government['s] requirement that Casitas build the fish ladder and divert water to it [for the public purpose of protecting the West Coast steelhead trout] should be analyzed under the *physical takings* rubric." *Id.* at 1293, 1296 (emphasis added).  It reasoned that although government action restricted Casitas's use of its right like in some regulatory takings cases, here, in contrast to regulatory takings cases, the government "actively caused water to be physically diverted away from Casitas *after the water had left the Ventura River and was in the Robles-Casitas Canal*."  *Id.* at 1294 (emphasis added).[17]  The court emphasized that some water had already left the Ventura River and was in the Robles-Casitas Canal when it was diverted.  *Id.* at 1291-92 ("[T]he government did not merely require some water to remain in stream, but instead actively caused the physical diversion of water away from the Robles-Casitas Canal—after the water had left the Ventura River and was in the Robles-Casitas Canal—and towards the fish lader, thus reducing Casitas'[s] water supply.").[18]  The court in *Casitas* also discussed the physical taking in

---

[16] For purposes of summary judgment, the government "conceded that Casitas has a valid property right in the water in question" and adopted the plaintiff's stated scope of its property interest.  *See Casitas I*, 543 F.3d at 1288.  The government also admitted that "it required Casitas to build the fish ladder facility," *id.* at 1290, and that "Casitas was forced by the [Bureau of Reclamation]'s adoption of the BiOp to build the fish ladder and divert the water," *id.* at 1293.

[17] "The fact that the government did not itself divert the water is of no import."  *Casitas I*, 543 F.3d at 1292-93.

[18] In *Casitas*, "the government admits that the operation of the fish ladder includes closing the overshot gate . . . which is located *in* the Robles-Casitas Canal, and that the closure of this gate causes water that would have gone into the Casitas Reservoir via the Robles-Casitas Canal to be divereted into the fish ladder."  *Casitas I, 543* F.3d at 1291 (emphasis added).

*International Paper Co. Id.* at 1292.[19]  According to the Federal Circuit in *Casitas I*, the Supreme Court in *International Paper* focused on the active role of the government.  *Id.*  It also specifically considered the fact that the water from the canal was already within International Paper Company's mill when the government issued its requisition.  *See id.*  When discussing the taking, the Court said, "The petitioner's right was to the use of the water; and when all the water that it used *was withdrawn from the petitioner's mill* and turned elsewhere by government requisition for the production of power it is hard to see what more the [g]overnment could do to take the use."  *International Paper Co.,* 282 U.S. at 407 (emphasis added).

In contending that a physical taking occurred, United draws parallels between its case and *Casitas*,[20] in which the court held that the physical takings doctrine applied.  United avers that in both cases, the plaintiff was required "to reduce its diversion of water to avoid liability under ESA."  Pl.'s Opp'n at 14.[21]  United also compares its claim to that in *International Paper Co.*, stating that in both cases, the government's restriction, which appropriated the use of water for a public purpose, decreased the amount of water the plaintiff could access for its use.  *See* Hr'g Tr: 22:21 to 24:21.  At the hearing, United emphasizes that in *International Paper Co.* "the [g]overnment directed a power company to divert water away from a paper company that had a right to use the water."  Hr'g Tr: 23:11-21.[22]

In contending the alleged taking should be analyzed under the regulatory taking doctrine the government distinguishes the physical takings in *Casitas* and *International Paper Co.* from the case at hand.  It states that these cases were analyzed under the physical takings doctrine because plaintiffs had to "return water [they] had *already removed* from the river."  *See* Def.'s Reply at 6-7.  Here, the government contends that NMFS "at most" required water to stay in the river.  *See id.* at 7.

In the factual circumstances at hand, United's claim should be analyzed under the regulatory takings doctrine.  Unlike *Casitas* and *International Paper Co.*, United does not allege that water that was already diverted into its diversion canal was required to be returned to the river.  Instead, United states that, to comply with the ESA and protect the endangered steelhead trout, water it *otherwise could have diverted* under its license and permit was used "as bypass

---

[19] The Federal Circuit in *Washoe Cnty.* also recognized that *International Paper Co.* involved a physical taking of water rights by the government.  *Washoe Cnty.*, 319 F.3d at 1326.

[20] United alleges that its claim is "nearly identical" to the claim in *Casitas*.  Pl.'s Opp'n at 14.

[21] United acknowledges that Casitas was required to "return water that had been diverted into the Ventura River Project to the Casitas fish ladder and the Ventura River," but does not directly address the significance of this fact.  *See* Pl.'s Opp'n at 14.

[22] In drawing the comparison, counsel for plaintiff quoted *International Paper Co.*, stating that in that case, water was "withdrawn from [International Paper Company's] mill."  Hr'g Tr: 24:8-14 (quoting *Intertional Paper Co.*, 282 U.S. at 407).

flow into the [Diversion dam] fish ladder and/or remained in the river." *See* Compl. ¶ 6.[23]
Because United does not allege that it had to return water it had already diverted, it has not stated
a physical takings claim, unlike in *Casitas* or *International Paper Co*. United's allegation that its
right to appropriate and divert water (or use water) was restricted by the 2016 OLE letter's "ESA
requirement," Pl.'s Opp'n at 19, should be analyed as a regulatory taking. Therefore, the court
turns to the permitting scheme under the ESA to determine if the regulatory takings claim is ripe
for adjudication.

### D. Ripeness

The parties disagree about whether United's claim is ripe for adjudication. For a
regulatory taking claim to ripen, there must be final agency action. "[A] claim that the
application of government regulations effects a taking of a property interest is not ripe until the
government entity charged with implementing the regulations has reached a final decision
regarding the application of the regulations to the property at issue." *Schooner Harbor Ventures,
Inc. v. United States*, 569 F.3d 1359, 1365 (Fed. Cir. 2009) (quoting *Williamson Cnty. Reg'l
Plan. Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled on other grounds by
Knick v. Township of Scott,* 139 S.Ct. 2162 (2019)). With respect to a regulatory taking claim
that arises under the ESA, a plaintiff (that is eligible to apply under Section 10) must have
applied for and been denied an incidental-[take permit for their claim to ripen. *See Doyle v.
United States*, 129 Fed. Cl. 147, 156 (2016). "[A]bsent denial of the permit, only an
extraordinary delay in the permitting process can give rise to a compensable taking." *See Boise
Cascade Corp. v. United States*, 296 F.3d 1339, 1349 (Fed. Cir. 2002). *Boise Cascade*
recognizes that "delay is inherent in complex regulatory schemes," and that the existence of a
permitting requirement alone is not sufficient.[24] *See id*. (quoting *Wyatt*, 271 F.3d at 1098).

To reiterate the parties' basic positions, United argues that its claim is ripe for adjudication
because it alleged a physical taking, not a regulatory taking, *see* Pl.'s Opp'n at 14-20, while the
government argues that the claim is not ripe for adjudication because United alleged a regulatory
taking and has not yet applied for and been denied an incidental-take permit under Section 10 of
the ESA. *See* Def.'s Reply 8-9.

United's claim is not yet viable for adjudication. Because the claim should be analyzed
under the regulatory takings doctrine, *see supra*, at 10-12, United must follow the ESA's

---

[23] Counsel for the government emphasized that "United Water's complaint makes clear
that the water it claims to have a right to use has remained at all times in the Ventura River and
that United has merely let the water flow by." Hr'g Tr. 8:15-18, 12:17 to 13:1. Counsel for
United demurred, stating that he "would not concede that . . . none of the water entered into the
diversion canal or into the facility at the [Diversion dam]." Hr'g Tr. 17:7-22. In support, he
suggested that diverted water could have first entered the diversion canal or the facility if an
auxiliary pipe existed. He did not aver in the pleadings or at the hearing that an auxiliary pipe
existed. *See* Hr'g Tr. 17:7-22; *see generally* Compl.; Pl.'s Opp'n.

[24] The ESA applies retroactively to licenses and permits, for example, that were entered
before the ESA was passed in 1973. A compensable taking can occur if a government action
under the ESA limits water use rights acquired before the ESA. *See Casitas*, 102 Fed. Cl. at 455.

permitting scheme for its claim to ripen.  United has not yet applied for an incidental-take permit under Section 10.  *See supra*, at 10.  If United applies for an incidental-take permit and the government does not act in a timely fashion in response to its application, United might have a claim that agency action was unreasonably withheld, *see Boise Cascade Corp.,* 296 F.3d at 1349-50; however, those facts are not before the court at this time.

**CONCLUSION**

For the reasons stated, the government's motion to dismiss pursuant to RCFC 12(b)(1) is GRANTED.

The Clerk shall dismiss plaintiff's complaint for failure to state a viable claim.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge